IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL D. NAPOLI, RECEIVER, | § | |
| THE TICKET RESERVE, INC., | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. _____ |
| | § | |
| | § | |
| CBS CORPORATION | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Michael D. Napoli Receiver for The Ticket Reserve, Inc. ("TTR"), files this Petition against CBS Corporation ("CBS") for acts constituting both common law and statutory fraudulent transfer of funds from TTR to CBS and equitable claims for money had and received (also known as assumpsit) and unjust enrichment.

## I.   PARTIES

1.     Plaintiff Michael D. Napoli is a lawyer residing and working in Dallas, Texas and a citizen of the State of Texas.  On May 24, 2016, the Securities and Exchange Commission ("SEC") filed a lawsuit against TTR and three individuals alleging that these defendants were in violation of federal securities laws.  The SEC asked this Court to enter a temporary restraining order to stop the operations of TTR, freeze assets of TTR and the three individuals, and appoint a receiver for TTR for the benefit of TTR's investors.  On that same day, this Court appointed Mr. Napoli as Receiver of TTR.

2.     Defendant CBS is a corporation incorporated under the laws of the State of Delaware and registered with the Texas Secretary of State to do business in Texas.   Defendant CBS has its principal place of business in the State of New York.  CBS may be served with

process at upon its registered agent, Corporation Service Company dba CSC, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218, or upon any officer of CBS at 51 West 52nd Street, New York, NY 10019.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because the Plaintiff and Defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.  It is estimated that Defendant's actions cost TTR, for which Plaintiff is Receiver, more than $1,500,000 in cash and other assets by extracting a fraudulent transfer from TTR when TTR was insolvent.

4.    This Court also has jurisdiction under its Order signed by Chief United States District Judge Barbara M. G. Lynn on May 24, 2016, giving the Receiver control over all assets of whatever kind and wherever situated of TTR pursuant to the provisions of 28 U.S.C. §§ 754 and 1692.  *See Haile v. Henderson Nat. Bk,* 657 F.2d 816, 823 (6th Cir. 1981); *SEC v. Bilzerian,* 378 F.3d 1100, 1103 (D.C. Cir. 2004); *Warfield v. Arpe,* No. 3:05-CV-1457-R, 2007 WL 549467 at *1 (N.D. Tex. Feb. 22, 2007); *Janvey v. Alguire*, 846 F. Supp. 2d 662, 669 (N.D. Tex. 2011). Venue is also proper based on the ancillary jurisdiction of the Receiver's complaint under *SEC v. Bilzerian,* 378 F.3d at 1107; *see also Scholes v. Lehmann,* 56 F.3d 750, 753 (7th Cir. 1995) ("[T]he laying of venue . . . is authorized by 29 U.S.C. § 754, which allows a receiver to sue in the district in which he was appointed to enforce claims anywhere in the country.").

5.    This Court also has jurisdiction over CBS because CBS does business in Texas under Tex. Civ. Prac. & Rem. Act § 17.042, is registered with the Texas Secretary of State to do business in Texas, and maintains a registered agent for service of process in Texas.  CBS has purposefully availed itself of the privileges of activities in Texas by regularly doing business in

Texas.  CBS has purposefully sought to serve the market in Texas and has continuously, systematically and deliberately exploited the Texas market.  CBS physically entered into Texas to promote its broadcasts in Texas, derived substantial revenue and other benefits by selling advertising to Texas businesses, and made substantial efforts to distribute its programs and increase their popularity in Texas. Jurisdiction over CBS, therefore, satisfies both the Due Process Clause of the 14th Amendment to the U.S. Constitution and the Texas long-arm statute for jurisdiction and does not offend traditional notions of fair play and substantial justice.

### III.    CONDITIONS PRECEDENT

6.      All conditions precedent have been performed or have occurred.

### IV.    FACTS

7.      TTR is a corporation, incorporated in Illinois with its principal place of business in Illinois.  TTR developed software to allow sports fans of particular teams to purchase options for tickets to major sporting events such as play-offs or final games so that, if their team was involved, the sports fans could be able to buy tickets to that sporting event.  TTR's CEO, Rick Harmon ("Harmon"), described TTR's business model as a way "to monetize anticipation."[1]

8.      TTR's idea was potentially attractive to people who wanted to buy tickets to major sports events only if their teams made it to the major events.  Sporting events such as the Super Bowl or the World Cup would be able to use TTR's software to develop an extra stream of income—a futures market of sorts—through offering options on a limited number of seats. Purchasers of these options were obligated to buy the tickets if their teams played in the sporting event.

---

[1] *See* http://www.chicagobusiness.com/article/20140830/ISSUE01/30830996/this-company-lets-you-reserve-a-seat-for-the-big-game

9.      TTR's original model was to sell options directly to the consumer sports fans and TTR's prospects seemed bright for a while.  In March of 2007, CBS decided to invest in TTR and paid $8,400,000 for 10,000,000 shares of TTR's preferred stock.

10.     But at the 2009 Super Bowl game, TTR sold more options than it had seats. When sports fans could not get the tickets that they had bought options for, TTR's reputation plummeted.  One or more class action lawsuits followed and TTR found itself facing expensive settlements and difficulty raising investors' interest.  TTR changed its model as a result.  It began licensing its software for use by others, such as college bowl games, which would then sell the options to consumers.

11.     The licensing model, however, never generated any meaningful revenue, certainly not enough to sustain TTR's cash flow needs, and TTR began to sink into insolvency.  TTR was insolvent at all times relevant for this suit.

12.     CBS was a shareholder in TTR.  CBS purchased a 10% stake in TTR on March 19, 2007 for $8.4 million.  CBS sold its shares back to TTR for $1.5 million on December 31, 2012.  TTR was insolvent before the sale, at the time of that sale, and after the sale.  TTR had no earned surplus before the sale and a negative net worth, at the time of the sale, or after the sale.

13.     Insolvency means being unable to pay debts as they become due in the usual course of business.  *See, e.g*, Illinois Business Corporation Act of 1983, §1.80(m).[2]  The Illinois Supreme Court in *Reilly v. Segert*, 31 Ill. 2d 297, 201 N.E.2d 444 (1964), held that shareholders may not sell their stock to a corporation while it is insolvent because of the adverse impact such a transaction would have on creditors.  It makes no difference whether the shareholder knew of the insolvency.  *Id*. at 299-300, 445.  A receiver may sue the shareholder to recover the proceeds of such as sale.  *Id*. at 300, 445.  TTR's insolvency is established by the numerous emails

---

[2] Illinois law applies because TTR was incorporated in Illinois.

describing the inability of TTR to pay its bills in the ordinary course of business as they became due and the audit report with a going concern warning as of the very day CBS sold its stock to TTR.  In fact, that insolvency was the reason why CBS was willing to sell its shares at such a huge loss just three years after its purchase.

14.     TTR's need for additional capital was an almost constant topic at its many board meetings where its officers and directors worried about paying bills and other past-due financial obligations.  The financial crisis was such that TTR's officers and directors often acknowledged that TTR needed to raise hundreds of thousands of dollars in a couple of weeks and sometimes within a few days to avoid a "meltdown" or "forced exit."  TTR obtained cash to cover its large annual operating losses by issuing promissory notes, as opposed to selling additional stock. These notes were for short terms—a few months each; they carried high interest rates and came with stock warrants.  These funds were obtained at the last minute when TTR had liabilities that simply had to be paid, such as payroll, taxes, and past due notes.  TTR, in other words, lived from note to note with any funding it received going to pay only those bills that absolutely had to be paid.  TTR never could amass meaningful working capital so that it could grow its business or become attractive as a saleable company.

15.     As TTR's CEO and board member, Rick Harmon, observed on December 30, 2012, "I believe the first and most significant conclusion a smart outside observer would come to is that we have brought in capital to address mostly yesterday's problems, it has not grown the company."  He described TTR as having a "month-end finger in the dyke" capital strategy.

16.     TTR's ability to obtain these notes was largely dependent on another of its board members, a financial advisor with RGT Capital Management, Ltd., named Ash Narayan ("Narayan") who invested his clients' money in TTR.  Harmon wrote on March 28, 2011, "As

we know, we've depended a great deal on Ash and he has come through time and again." Many of Narayan's clients were current and former professional athletes—persons with high-dollar incomes but often with little or no investment experience. Although Narayan's clients almost always directed that their money should be in placed in low-risk investments, Narayan invested their funds in TTR, a company he knew was an extremely high-risk investment. Over time, Narayan put in more than $30 million of his clients' money into TTR. Often these investments were made without disclosure of the risk to Narayan's clients, and sometimes the investments were made without the clients' knowledge and with forged signatures. Narayan never disclosed to his clients that TTR was insolvent, that he was on the TTR Board, or that he was receiving huge finders' fees from TTR for directing these investments to TTR. In fact, Narayan and Harmon arranged that payments to Narayan for procuring investors be disguised as board fees or "loans" to him from TTR for which he would sign promissory notes, never intending that Narayan would actually pay those notes.

17. CBS originally tried to sell its shares back to TTR on October 21, 2010 for $1.5 million. The closing deadline on CBS's offer was on or before December 20, 2010. On December 8, 2010, CBS extended that deadline 30 days because TTR did not have the money to buy the stock. On December 21, 2010, Harmon wrote, "we may reach year-end facing another limited financing band-aid." On December 31, 2010, however, Harmon reported, "we were successful in meeting the year-end challenge."

18. The amended deadline for TTR to pay CBS for its stock was January 20, 2011. On January 5, 2011, Harmon told his lawyer, "We need to strategize on how to get more time from CBS. While I may have some shots at getting this funded before the current deadline, it is remote." The next day, Harmon asked his lawyer to tell CBS that TTR received a little over $1

million in new capital on December 31 "to meet absolute essentials at year-end." He also asked the lawyer to let CBS know that the company's capital source will probably not provide more funding unless CBS extends the deadline again. Those "essentials" included paying back taxes, lawsuit settlements, past-due bills, and significant sums to employees, stockholders and other insiders – including $200,000 to Rick Harmon in cash and $45,000 for corporate jet charters he used. As of January 7, 2011, TTR only had $175,000 left out of the $1.5 million that had come in the week before. TTR requested an additional extension from CBS on or around January 7, 2011. On January 8, 2011 TTR's CFO emailed Harmon about the need to raise an additional five to eight million dollars to pay more back taxes, pay off notes from investors, settle past due accounts and obligations with rights holders, law firms, and vendors, and to purchase the CBS stock.

19.     On January 10, 2011, CBS rejected another extension, but invited TTR to come back to them if TTR ever got the money to redeem its stock. On January 11, 2011, Harmon wrote, "I must do what is required to complete the CBS transaction before its deadline of 1/20, since they have rejected an extension" and said, "tomorrow morning we can begin to 'pass the hat'." On January 18, 2011, TTR attorney told CBS "I understand that TTR has the money lined up. . . . I think they'll have cash in hand Monday/Tuesday" and requested another extension until Wednesday. CBS agreed in a voice mail to extend the deadline only as far as Friday. On January 20, 2011, Harmon wrote that TTR's "operating expenses [are] in serious arrearage." After some networking, CBS informally agreed to one final extension on January 25, 2011 saying, "Ok giving Rick 30 more days if he can really get the cash." That language indicated that CBS had its doubts considering TTR's prior claim to have the cash. A January 31, 2011 email shows TTR had accounts payable and other current liabilities of over $7 million.

20.     On February 2, 2011, Harmon wrote, "everybody (and I mean everybody) . . . continues to treat us as somewhat damaged goods," that one observer noted the company had not been "fully capitalized," and that he believed a current note holder with liens on all TTR's assets "desire[s] to take over the company, put it through an eleven [bankruptcy], and then capitalize it." Harmon admitted that desire was "logical."

21.     As of February 7, 2011, TTR lacked the funds to pay its franchise taxes. On February 9, 2011, TTR told its shareholders it had raised $9 million in debt capital over the last two years, but lacked the money to do the CBS deal or pay off $2 million in "arrearages" which "'hamstrings' our ability to license the product." On February 16, 2011, TTR's attorney told CBS he understood TTR expected to have the cash to pay CBS by Friday. The next day, he even told CBS he had a check in his desk drawer and knew the funds were coming into TTR. That day, Harmon had told the attorney, "We're down to the 'lock log' on the CBS deal. Right now we can't do it, but it's not over till it's over." TTR never got the cash, could not close, and the original 2010 deal for CBS to sell its stock back died on February 24, 2011.

22.     TTR's insolvency continued throughout 2011. On March 2, 2011, TTR's attorney told CBS that, for TTR, "obviously cash is a problem." On March 13, 2011, Harmon said he had been "grinding with Ash to get the [new lender] commitments coming." On March 16, 2011, an outside observer commented that "TTR has no more life than a dead fish lying on the beach." On March 28, 2011, Harmon wrote the board about the need to raise more money, saying everything else we are doing "pales" in comparison and "we have got to get aggressive." Harmon even admitted that he had "kept trying for institutional [investors] but [had been] turned down every time." One of the board members responded that the company was having difficulty raising money because of "a weak balance sheet" and no real cash flows. The board member

also mentioned the possibility of bankruptcy.  The truth of the matter was - and Harmon admitted as much in an email dated February 12, 2011 - that TTR did not want to use venture capital or private equity to solve its liquidity problem because that type of investor almost certainly would have wanted to restructure TTR and lower or eliminate the board members' compensation and make changes to the executive leadership to improve skills. A knowledgeable investor would not, for example, have allowed Harmon to use TTR money - over $100,000 - to settle a personal claim against him by a bank to whom Harmon owed money for a private plane.  Even while TTR was insolvent, it was being drained of cash by its own officers.  No wonder Harmon pointed out that TTR had to keep using Narayan's clients for funding was because that kind of funding "avoids deep due diligence that we probably could not withstand."

23.     On April 22, 2011 (a Friday), TTR needed money by that next Friday to pay off a note and had several hard-pressing obligations.  On May 23, 2011, Harmon wrote, "we have been swimming against current the last 2+ years" and "doing a remarkable job of staying afloat." On May 26, 2011, TTR had cash to cover May's month end, but not June.  On August 8, 2011, TTR's attorney told TTR that it could get out of honoring the redemption date for its Series A Preferred Stock by telling the stockholders that "the Company's board of directors has concluded that the Company does not have funds legally available for redemption of the shares of Series A Preferred Stock."  TTR's attorney was not referring to CBS' preferred stock, but the legal point is the same—a stockholder cannot sell shares back to an insolvent company and TTR knew that fact.  TTR's financial condition never improved. Later, after redeeming its stock from CBS, John Kaptrosky (TTR's CFO) told Harmon and Narayan in October of 2013 that TTR could not redeem stock from another Narayan client, even though TTR had just gotten a cash infusion from still another Narayan client.  Because TTR was prevented from redeeming this stock, Kaptrosky

arranged for another investor to buy the stock to placate Narayan's client.  Thus, both before and after its redemption of CBS stock, TTR admitted that it was legally prevented from redeeming its own stock by its insolvency.

24.      Harmon told the board on August 14, 2011 that momentum was slow, and that "we have had many challenges and gut checks." He said the board must look at TTR's capital needs since the "baseball market has thus far been a dud," "we have one and only one market now operating," and "TTR has had no real marketing and/or PR for quite some time."  He said the company lacked the money to be able to fund new licensees and that the company was "at risk."  "We do not have the $200k to meet month end expenses" and "until we finally fund the arrearages to the NCAA," TTR does not have the credibility to get new licensees.  On August 30, 2011, Harmon told the board the minimum cash requirements for the end of the month were $250,000.  On August 31, 2011, Harmon wrote: "We are at a very tough crossroads.  We have to find the final capital funding and quick.  I've got a real 'bugger' facing me.  Board call tomorrow and hope I will find the necessary immediate solutions.  Don't mean to sound too dramatic, but we got a real humdinger of a bridge to cross."  On September 8, 2011, Harmon thanked the staff for their quiet forbearance about the missed payroll at the first of the month.  On September 14, 2011, Harmon said the company's senior lender is "running scared," and that Narayan is "in over his head."  We need $5 million "to give us (me) the last shot and runway to pull the rabbit out."  By December 20, 2011, TTR's attorney asked TTR to pay some of his firm's large past-due bill because "the pressure continues to mount" and "this will affect me personally."

25.      TTR remained insolvent throughout 2012.  On April 4, 2012, Harmon wrote the board that the company needed an additional $5 million in funding to pay off a note and meet other obligations.   On May 22, 2012 Harmon said the board needed to discuss trying to

restructure CBS's position if not take them out entirely.  The company's attorney refused the invitation to attend the board meeting in person because "just being candid, travelling with a client with a/r like we have is really going to make a bad situation worse for me."  On May 30, 2012, Harmon told TTR's attorney to disclose to CBS that "the Company has found itself with a total ZERO in cash flow since December . . . . "the total funded unsecured debt is $13M and the secured is $2M, Orrick [the attorney's firm] is still owed $500k and there is no cash in the bank and no cash flow until September at least."  In other words, TTR made sure that CBS was told TTR was insolvent and had little prospects for the future.  On May 31, 2012, TTR's attorney relayed to Harmon that he had called CBS.  CBS's first question was whether TTR was still in existence.  CBS then asked about the balance sheet; TTR's attorney told CBS it "was worse than where it was when we had our deal on the table."

26.     Still CBS expressed interest in a stock redemption, and TTR's attorney told CBS that David Hadley (TTR's investment banker) would be in touch about the financial details.  On May 31, 2012, Hadley contacted CBS to introduce himself, and noted that TTR had not formally engaged his firm since TTR is "not in a position to make retainer payments."  On June 1, 2010, Hadley relayed the call he had with CBS to TTR.  He said he had told CBS that TTR's "balance sheet is worse than ever," and that the secured lender has extended a few times but will not extend beyond June 30 without a plan.  Hadley and CBS agreed to do the same deal CBS had offered in 2010, close by November 30, and "use that agreement to secure forbearance from the secured creditor so that we could try to finance or [sic] asset sale our way out of our challenges by then.  Bottom line, we would 'fill or kill' by the end of the year."  On June 6, 2012, Harmon asked TTR's attorney to inform CBS that TTR had not paid its 2011 state franchise tax, would be dissolved by the state at the end of the month, and that the board would only pay those taxes if

they have a deal with CBS.  Later that day, TTR's attorney sent CBS financial statements showing TTR had a net loss of $5 million in 2011 and had lost over $1 million in the first three months if 2012.  Its total liabilities were $24 million, while its total assets were just $2.6 million with only $122,595 in cash.

27.     On June 12, 2012, Hadley told CBS "the company has essentially no cash right now" and "will generate no revenue that I am aware of prior to Sept. or Oct. . . . The company has secured two extensions from its secured creditor and needs another one, has significant arrearages to vendors, and suffers from 'general balance sheet stress.'"  Over the following days, Hadley kept reminding CBS that the deadline for paying the secured creditor was June 30, and that they could not get an extension unless they could tell the creditor they had a deal with CBS.  On June 20, 2012, Harmon wrote Narayan that TTR needed $300k "this week"—"We have to operate and it's getting dicey."  On June 29, 2012, Hadley wrote CBS that "TTR made its most recent payroll because an existing creditor of the company dug deep 'one last time.'"  Hadley said that he was "sure that CBS wrote off its investment in the company long ago" but urged CBS to agree to a new deal quickly because "the oxygen is getting thin."  CBS responded that it needed the approval of CBS's CFO, and that CBS "hope[d] that the company is able to work with the creditors in the meantime."  On July 11, 2012, TTR's attorney told CBS that "TTR has a board meeting Friday morning, where they have to consider some difficult decisions" in the absence of an agreement with CBS.  TTR and CBS signed a new version of the 2010 agreement the next day—a sale to occur by December 15, 2012 and no other changes from the original deal.

28.     On July 13, 2012, Harmon told TTR insiders to not discuss the realities of TTR's finances in front of the new head of business development for TTR, because no "desperation" could be shown.  On September 11, 2012, Harmon wrote of the need to raise money for paying

arrearages, the absence of working capital and that TTR had no certain funding to meet end of September requirements.  As of November 15, 2012, TTR was still trying to raise money to cover the CBS deal, legal bills, notes that were due and working capital.  On November 29, 2012, Harmon wrote that he and Narayan were going to try to raise the money for the CBS deal since "Hadley has not been able to deliver anything."  On December 6, 2012, Hadley told CBS that TTR did not have the money to close and requested an extension.  On December 7, 2012, the parties extended the closing date until December 31, 2012.  On December 11, 2012, Harmon told a fellow director that TTR "got a 15 day extension on CBS but frankly right now I'm not sure it will do any good."  On December 27, 2012, Harmon wrote, "We scratched together $1.5M for CBS," but added he was "not pleased as you know with sending this capital to CBS without working capital in the bank."  TTR wired $1.5 million to CBS on December 28, 2012.  That same day, Harmon wrote that buying the CBS stock has left TTR's "cupboards bare" of working capital, adding "sacrifice by all will need to continue," and he attached a listing of "the obligations we 'traded off' here at year-end in order to meet the CBS deadline. . . . .We have suffered by not being able to get out of the reactionary, day2day management that our capital structure has dictated."  The past-due debts that were traded off included payroll taxes, legal fees, and accounting fees among others.   Harmon's email was an admission that TTR was "trading off" or delaying payment to creditors to whom it already owed obligations in order to transfer money to CBS—a transfer that it was illegal for TTR to make.  The closing of the CBS redemption was December 31, 2012.  On January 2, 2013, Harmon sent the board a listing of unfunded liabilities and obligations that the payment to CBS meant that they would not able to meet.

29.     Not only was TTR "trading off" its debts to creditors in order to transfer money to its shareholder, CBS, TTR's insolvency was also worsened by its transaction with CBS because TTR borrowed $1.7 million from one of Narayan's clients to pay CBS.  This was done without the knowledge or consent of Narayan's client.  Narayan was paid a $175,000 finder's fee on that transaction.  Thus, the net effect of the transaction from the perspective of TTR's creditors was the loss of $1.5M paid to CBS, $175,000 paid to Narayan and the addition of $1.7M in debt.  Another option would have been for Narayan's client to purchase CBS' shares for $1.5M, but that would not have resulted in Narayan receiving the finder's fee.

30.     The report from TTR's independent auditor on TTR's financial status as of December 31, 2012, when CBS sold its shares back states: "As discussed in Note 1 to the financial statements, the Companies have suffered recurring losses from operations and have a net capital deficiency that raises substantial doubt about their ability to continue as a going concern."  Note 1 said:

> [T]he Companies have a working capital deficit and continue to incur operating losses.  In addition, the Companies are delinquent on approximately $2,292,394 of notes payable and have no agreements in place to assure the noteholders will not demand payment immediately.  Another $1,754,500 of notes are due to mature by the end of June.

As of December 31, 2012, the audited financial statements reflected cash of just $153,306 and accounts payable of $1,854,042.  Total current assets were $224,475 while total current liabilities were $13,574,362.  The accumulated deficit was $66,888,729 and total stockholder equity was a negative $27,211,469.  Total assets were $3,529,718 while total liabilities were $30,741,187.  Licensing revenues for all of 2012 totaled just $272,473 while operating expenses were $3,706,911.  The net loss for the year was $5,178,702.  In other words, the audited financial statements as of the date CBS sold its stock confirm what is in the emails – TTR was insolvent.

31.     The history of the transaction in which TTR repurchased its stock from CBS, as well as the communications between CBS and TTR, establish not only that TTR was insolvent but that CBS was fully aware of TTR's financial troubles and insolvency when it negotiated, agreed to and completed the redemption. CBS was not acting in good faith considering the disclosures made to it about TTR's financial condition.  CBS was a substantial shareholder in TTR and had been so since 2007 when it acquired approximately 10% of the company by purchasing preferred shares for $8.4 million. After extensive discussions during which TTR revealed its insolvency and deepening financial crisis, TTR and CBS agreed that TTR would redeem CBS's preferred shares for $1.5 million, despite TTR's inability to pay its creditors or meet bills that were already due.

32.     TTR's redemption of its own stock was illegal under Illinois common law because it was made when TTR was insolvent and under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/2 *et seq.* because it was made with actual intent to hinder, delay, or defraud creditors of TTR or without receiving a reasonably equivalent value in exchange for purchasing its own stock when TTR's assets were unreasonably small in relationship to its business and when TTR knew it was incurring debts beyond its ability to pay. TTR also transferred money to CBS that CBS had no right to receive and by which CBS was unjustly enriched at the cost of TTR's creditors.

33.     TTR's insolvency continued for the remainder of its life and TTR was only able to "stay afloat" with cash infusions from Narayan's clients. On May 25, 2016, the Securities and Exchange Commission seized control of TTR and asked this Court to appoint Plaintiff as a Receiver to stop "an ongoing multi-million dollar fraud scheme."  The Receiver was given the authority to "marshal[] and preserve[] all assets of the Defendant The Ticket Reserve Inc."

including the right to "pursue and preserve all of its claims" and to bring such legal actions . . . as the Receiver deems necessary or appropriate."

34.     The Receiver now brings this suit to recover the $1,500,000 TTR paid to CBS to repurchase its stock, because TTR could not repurchase its own stock when it was insolvent under Illinois common law, because the transfer was fraudulent with respect to TTR's creditors under Illinois's Fraudulent Transfer Act, and because CBS was unjustly enriched by the transfer of money from TTR to CBS and because CBS holds money from TTR that belongs, in equity and good conscience, to the Receivership Estate.

35.     This Court's Order Appointing Receiver (Dkt. 12) dated May 24, 2016, stayed all civil legal proceedings, enjoined the filing of any suits by or against the Receiver, and tolled all limitations on those claims.  Thus, any limitations on these claims were tolled from the date of that order, both by Court Order and by Illinois statute. *See* 735 ILCS 5/13-216; *In re Werner*, 386 B.R. 694 (N.D. Ill. 2008).

36.     For all these claims, the Receiver pleads the discovery rule.  The discovery rule applies when a receiver is appointed. TTR was dominated by its CEO, Rick Harmon, and by a board of directors that transferred $1,500,000 from TTR to CBS when Harmon and the other directors—and CBS—knew that TTR was insolvent and would not be able to pay its other creditors because of this transfer.  Because TTR was dominated by individuals engaged in conduct harmful to TTR, limitations on that conduct did not begin tloo run until the Receiver was appointed.  The Receiver was appointed on May 24, 2016.

37.     Once a receiver is appointed, the discovery rule is applied based on what the receiver discovers, not what prior management knew.  Because TTR was the "robotic tool" of Harmon and TTR's other officers and directors, TTR could not know of its own injury until

Harmon and TTR's other officers and directors were removed and the Receiver was appointed. In this case, the Receiver has had to go through hundreds of thousands of emails and ten years of financial records and corporate records. He has had to review interviews conducted by the SEC and take depositions to discover his claim against CBS. The Receiver was appointed on May 24, 2016. This suit was filed as soon as the Receiver "knew or could reasonably have known" that the transfer to CBS was fraudulent so that limitations were tolled by the discovery rule on the Receiver's claims.

## V.      CAUSES OF ACTION

### COUNT 1—COMMON LAW RIGHT OF RECEIVER TO RECOVER PAYMENT TO A SHAREHOLDER BY INSOLVENT CORPORATION.

38.      The Receiver incorporates all the foregoing paragraphs by reference to this and to the following claims.

39.      The Receiver was appointed to recover and conserve Receivership Property. *See* Order appointing Receiver, ¶35. Because TTR was insolvent at the time it redeemed its shares from CBS for $1.5 million, the Receiver has a right to recover that payment to CBS for the benefit of the Receivership Entities. *Reilly v. Segert*, 31 Ill. 2d 297, 299-00, 201 N.E.2d 444, 445 (1964).) The Receiver asks that the money CBS received be returned to the Receivership Estate for the benefit of that estate.

### COUNT 2—CLAIM FOR MONEY HAD AND RECEIVED.

40.      In the alternative, the Receiver also asserts the equitable claim for money had and received (sometimes called assumpsit).

41.      CBS was a shareholder of TTR. CBS obtained money from TTR when TTR was insolvent and CBS knew that it was insolvent or—at the very least—suffering from severe financial difficulties. CBS, therefore, received money which in equity and good conscience

belongs and should be returned to the Receiver."

42.     CBS received money that, in equity and good conscience, it should not be allowed to retain.  The Receiver asks that the money CBS received be returned to the Receivership Estate for the benefit of that estate.

## COUNT 3—UNJUST ENRICHMENT

43.     In the alternative, the Receiver also asserts the equitable claim of unjust enrichment for the $1.5 million that TTR paid to CBS for the redemption of its TTR stock when TTR was insolvent and CBS was aware of that insolvency.

44.     CBS was unjustly enriched by receiving a benefit to the detriment of TTR and the Receivership Estate.  CBS's retention of that benefit violates the principles of justice, equity, and good conscience.

45.     The Receiver asks that this Court order that CBS return the money it received from TTR in redemption of TTR's shares to the Receivership Estate.

## COUNT 4--FRAUDULENT TRANSFER

46.     Under Illinois's Uniform Fraudulent Transfer Act ("IUFTA"), Illinois Compiled Statutes ("ILCS") Chapter 740, Act 160, §1 *et seq.*, TTR's payment of $1.5 million to CBS was a fraudulent transfer that the Receiver is entitled to void and recover for the Receivership Estate.

47.     The Receiver asks this Court to void this transaction as fraudulent as to TTR's current and future creditors under IUFTA, 740 ILCS 160/5. [3]

---

[3] Section 5 of IUFTA reads as follows:

  § 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
  (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
  (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
  (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

**A.      Claim for Fraudulent Transfer Under IUFTA §5(a)(1).**

48.      Section 5(a) of IUFTA makes a transfer fraudulent as to TTR's current and future creditors if TTR made the transfer "with actual intent to hinder, delay, or defraud any [TTR] creditor." *See* 740 ILCS 160/5(a)(1).  Harmon admitted TTR had "traded off" many past due obligations, including payroll taxes, note holders, and professionals, to redeem CBS's stock. That shows an unmistakable intent to at least delay creditors.  In addition, IUFTA lists eleven non-exclusive factors that courts may consider in determining whether fraudulent intent exists. 740 ILCS 160/5(b)(1)-(11).  As pleaded above, at least seven of those eleven factors apply to TTR's transfer of $1,500,000 to CBS:

- TTR's transfer was to an insider, since CBS was a shareholder with the right to a seat on TTR's board (factor #1);
- Before the transfer was made, Harmon and Narayan (at least) knew of the potential liability they and TTR faced for securities fraud and other torts (factor #4);
- TTR's transfer was of substantially all its assets—it left TTR's "cupboard bare" as shown above (factor #5);
- TTR had removed or concealed its assets by spending millions of dollars for the benefit of Rick Harmon its president, director and major shareholder by paying him an excessive salary, leasing condominiums for his use in California and Texas, paying his credit card bills (averaging about $32,000 per month), paying for his extravagant lifestyle, and awarding him excessive bonuses or board fees,

---

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

and by paying large sums to TTR's director Ash Narayan for kickbacks (factor #7);

- TTR did not receive reasonably equivalent value for the transferred funds because TTR's creditors received no benefit from TTR's acquisition of its own stock, especially since those transferred funds were borrowed which increased TTR's legal and financial liabilities (factor #8);
- TTR was insolvent before the transfer was made and even more insolvent after the transfer was made as shown above (factor #9); and
- TTR's transfer occurred shortly after TTR had incurred substantial debt to be able to make the transfer to CBS (factor #10).

These factors are often called "badges of fraud" that, when present in sufficient number, give rise to an inference or presumption of fraud. These factors show that TTR, acting through its board members and officers, intended to hinder or defraud its creditors.

49.    The Receiver has shown that TTR's CEO, Rick Harmon, knew that TTR was surviving on the investments of Narayan's clients and that those clients (to whom Narayan owed a fiduciary duty) were not being told of the risk that investing in TTR entailed or else they would not have invested in TTR. Harmon and Narayan knew that Narayan's money was going to a business that had been teetering on the brink of bankruptcy for years and that Narayan's clients' investments were being used to cover necessary business expenses, like payroll, taxes, and legal fees, not to grow the business or generate profit. Harmon also knew—because he helped create this arrangement—that Narayan was being paid fees out of his clients' investments that were being disguised or hidden as "loans" to Narayan which TTR knew he never intended to pay back. TTR was involved in—indeed based its whole capital structure—on a fraudulent scheme that used investor money to put a "month-end finger in the dyke" while still funding Harmon's lavish life style and paying Narayan large, but hidden, fees from his own clients' investments.

50.    TTR's board of directors consisted of Richard Harmon, Ash Narayan, and Herbert Rudoy. Harmon also served as CEO. These men ran a multi-million fraud scheme through TTR. Almost always without their knowledge or consent, Narayan directed his clients

into high-risk investments in TTR.  In exchange, he received almost $2 million in undisclosed finder's fees.  He, Harmon and John Kaptrosky (TTR's CFO) obscured this arrangement by mischaracterizing the finder's fees as either "director's fees" or "loans."  They further attempted to conceal the scheme by creating fraudulent documents – sometimes backdated – and by making Ponzi-like payments to hide TTR's huge losses from Narayan's clients.  Harmon also used TTR to fund his own lavish lifestyle, which included stays in "ridiculous suites" at luxury hotels such as the Waldorf Astoria, rent on luxury condominiums at the Four Seasons in Austin and a resort in California, international travel, and meals at extravagant restaurants.

51.     Throughout this time, Narayan was employed as an investment advisor representative and Managing Partner in the California office of RGT Capital Management, Ltd. In that capacity, Narayan invested over $35 million of his advisory clients' assets in TTR. Narayan did not tell his clients, to whom he owed fiduciary duties, key information that he knew about TTR, including that TTR was financially distressed.  He did not tell them that the TTR had determined the fair market value of TTR's shares was only a penny, and later that TTR's shares were acknowledged as worthless.  Nor did he tell them that he had serious conflicts of interest— that he sat on TTR's board of directors, owned millions of shares of TTR stock, and had secretly been paid nearly $2 million in undisclosed finder's fees – usually paid out of client funds – in exchange for securing investments in TTR.  Narayan also invested his clients' money into TTR without their knowledge or consent.  Harmon and Narayan acknowledged in communications between themselves that they could "not withstand" a "deep due diligence," they were facing a "meltdown," that it would be "hot and ugly," "disastrous," they were in a "Catch 22," they were "boxed in," that they alone "share[d] the risk," that they were "at the end of our rope," had to "face the truth or consequences," that if Narayan didn't continue to fund they were facing "all

the transparency of transactions in the last few years being opened up and viewed with somewhat forensic depth," that Narayan had "put himself in a difficult position in such a way as to put [TTR] potentially at risk," that "an unwinding of this company will be really ugly, lawsuits will fly in all directions, and not even a Chapter VII will insulate us," that the "fiduciary responsibilities of the board will be severely challenged in court," and "we are one missed payment from being uncovered." Narayan had a duty to fully disclose all this information to his investment advisory clients, but could not and did not.

52. Together with Narayan, Harmon and Kaptrosky, carried out the scheme by making undisclosed finder's fee payments to Narayan – often paid out of client funds – and concealing their true nature by memorializing them as "directors fees" or "loans," drafting and executing sham promissory notes between TTR and Narayan in order to further conceal the fraudulent payments (and also to help Narayan dodge taxes), and attempting to conceal the fraud by approving Ponzi-like payments to Narayan's clients who had previously invested using new investor funds from Narayan's other clients. They also disguised millions of dollars in payments to Harmon by funding his lavish lifestyle through TTR, paying him rent on condos he owned, paying leases for him, paying him compensation, paying his expenses and making him loans. Harmon and Kaptrosky increased the budgeted payments for Harmon's credit card and salary to get even more money out of Narayan's investors. Harmon also kept negative information about the prospects of selling TTR from Narayan to get more money from Narayan's' clients. All of this actively depleted funds available to pay TTR's defrauded creditors and prevented TTR from using the money to operate properly.

53. They, and particularly Harmon, kept the scheme alive by overselling TTR's prospects in the marketplace and the promise of an "exit" which would involve selling the

company for millions of dollars.  At one point Harmon even claimed TTR could be a "billion-dollar baby."  They did all they could to keep TTR alive for their own benefit, when they acknowledged that 99/100 management teams would have bankrupted the company after the 2009 Super Bowl.  One outside observer stated: "TTR has no more life than a dead fish lying on the beach."  Harmon acknowledged in 2011 that bankruptcy was "logical, but it ain't going to happen."

54.     Narayan's clients relied on Narayan to direct their investments conservatively.  They would not have invested in TTR had Narayan disclosed to them, as his fiduciary duty required, all the horrific statements contained in TTR internal emails about the financial troubles TTR was having.  Harmon, Rudoy and Kaptrosky must have known Narayan was violating his duties and misleading his clients.  TTR was searching far and wide for investors at any cost, but nobody other than Narayan's clients would invest[4] even though TTR engaged investment bankers to help them find other investors.  One of these investment bankers referred to TTR as a "hair-brained idea" and joked that the notes he was working to place with investors could be called "SIN notes."  All the directors and officers knew there was no realistic way to raise funds from third parties and that no rational investor would invest in TTR given its financial condition.

55.     There are many thousands of emails in this case, yet in none of them do Harmon, Rudoy, Kaptrosky or any other insider at TTR ever question how Narayan could get investors to invest their money every time money was needed when nobody else was able to bring in investors.  Similarly, there are no emails expressing shock at the SEC investigation or suggesting any effort whatsoever by TTR officers, employees, and advisors to determine whether Narayan had been defrauding investors as the SEC claimed.  That is because they knew that Narayan was

---

[4] Harmon has testified that as much as 90% of the money invested in TTR after the 2009 Super Bowl came from Narayan's clients.

defrauding investors.

56.     Harmon, Kaptrosky, and Rudoy had received emails from Narayan suggesting misrepresentations they could make to potential investors, including Rudoy's clients that Rudoy owed fiduciary duties to.   They knew others had refused to invest in TTR because it was undercapitalized and suffering from shareholder fatigue.   They knew Narayan could get his clients to invest on extremely short notice and with no due diligence or attorneys, when other potential investors conducted due diligence, retained attorneys and took their time.   They knew many investments by Narayan's clients were not documented, and that back-dated documents were created after the fact – which Harmon and Kaptrosky participated in.   They knew the terms of the notes to Narayan's clients had less protection than the ones to the few third-party investors.   They knew many of the notes to Narayan's clients were past due, but that the clients neither insisted on payment nor extracted consideration for an extension as any prudent investor would have done.   They knew the fact that Narayan, as a director of TTR that wanted to keep its financial troubles a secret and investment advisor to his clients who were entitled to full disclosure of all problems from Narayan, had conflicting fiduciary duties that could never be reconciled.   They assisted Narayan in making Ponzi-like payments using money from new investments by some of his clients to pay off earlier investments in TTR made by his other clients. They knew Narayan was filtering information going to his clients about TTR, and avoided communicating with his clients directly as they did with other investors.   They agreed to pay Narayan finder's fees out of his client's money, and agreed to disguise those payments as described above.   They, together with Narayan, devised a strategy to get Narayan's clients to invest even more money by exercising expired stock warrants at a price that was at least ten times higher than they had said was fair market value.   Harmon and Narayan schemed together

to try and use one of Narayan's clients to guarantee a $5 million bank loan for TTR in such a way that the client would not know about the guarantee. Narayan had forged that same client's signature to other documents relating to TTR.

57.     Harmon promoted misrepresentations by Narayan by stating he could say things in meetings with investors that could not put in writing and suggesting and allowing Narayan to put things in cover letters to his clients that did not go to other investors. Harmon and the other board members prepared, and presumably used, unreasonable revenue forecasts. Harmon sent inaccurate capitalization tables to potential investors to persuade them to invest. Harmon told those working on TTR's behalf not to disclose the SEC investigation to potential investors. Harmon drafted an update to shareholders noting that Narayan had left the TTR board, but omitted any mention of the SEC investigation or the wrongdoing that had been uncovered by the SEC and Narayan's firm. Harmon told Rudoy and others: "It is imperative that we address Ash's attitudes and actions. If we don't do it form an internal family approach, it is inevitable it will be done from the outside which would not likely be pretty." Harmon also stated that Narayan's "behavior right now is one of total disgust in [TTR] and in himself for getting into this position." He also said, "we all have a tremendous amount at risk."

58.     Harmon emailed Narayan in January 2013: "We could not be on the cusp to realize success without your ability to bring the capital. It is only you and I alone that really share the risk. We did not BK the company ~ 4 years ago when 99/100 ownership/management teams would have. We continued to fund the company in remarkably creative ways, but certainly not in any way that could even closely resemble 'traditional' . . . . it has not allowed us to be in a position to communicate with stakeholders as fully and transparently as a traditional capital strategy would have allowed." He also admitted to having kept investors "in the

mushroom field." Harmon urged Narayan to invest more of his client's money in TTR because "there is no realistic way to raise capital from third parties."

59.     Harmon pressured Narayan to continue the funding using a carrot-and-stick approach. Harmon would overly promote the prospects of TTR's business by touting the significance of meetings with potential customers and investors and by overstating the prospects of selling TTR so that Narayan's clients could be paid back. Harmon would also threaten Narayan with the exposure of his fraud, noting that without further investment "the Company must do a difficult restructuring, with all the transparency of transactions in the last few years being opened up and viewed with a somewhat forensic depth." He told Narayan that if TTR shut down, the "fiduciary responsibilities of board will be severely challenged in court." Harmon also told Narayan, and others they had "a tremendous fiduciary responsibility, that unwinding the company will be really ugly, lawsuits will fly from all directions, and not even a Chapter VII will insulate us, we will not go quietly into the night and if we do melt down, then all our realities for years to come may not be pleasant." Harmon also told Narayan if TTR was forced into bankruptcy the "fiduciary responsibilities of the board will be severely challenged," and "the loans from the company to you likely cannot be defended in a bankruptcy." Harmon exploited the fact Narayan was "really boxed in – big time" between his need to sale TTR to pay off his clients and the need to invest still more of his clients' money in TTR so it could survive until a sale. The only way TTR could continue and avoid a "meltdown" was with more money from Narayan's clients.

60.     On or about December 26, 2012, Narayan invested an additional $1.7 million into TTR on behalf of one of his clients. He did so without that client's knowledge or consent. A $175,000 finder's fee was paid to Narayan on December 27, 2012. $1.5 million was paid to

CBS on December 28, 2012.  On December 30, 2012, Harmon told Narayan:

> I want to share my innermost views solely with you; those that only you and I can grasp/understand.  But certainly I am not going to try and put them all in this email.  There is no way to post a 'W' until we can sell the company at a minimum of $100M+. . . . [T]here is no way we will realize the $100M+ exit without some fundamental changes . . . . And some of the changes that 'a world's very best consultant' might conclude are necessary to be made, are perhaps problematic for you and me. . . .  What I am trying to communicate (and will continue to do so), is that you and I in particular still have a genuine 'Catch 22'.  We must honestly find a way to get out of this. . . . I do not want to put more than this in an email at this time for many reasons.

Thus, the payment to CBS was inextricably intertwined in the fraud Harmon and Narayan were committing.

61.    Harmon, Narayan, Rudoy, and Kaptrosky were in near constant contact.  They had frequent board meetings averaging a meeting once per month.   They were also in regular contact by phone and email, especially Narayan and Harmon.  All the facts set out above are from emails.  The discussions between the officers and directors in person and on the phone must have been much worse.  There are several emails that say things like:  this email was "sanitized because of the obvious risks of putting too much 'flavor' in writing," "I do not want to put more than this in an email at this time for many reasons;" and "the bad news is what I need to share with you over the phone." There are over 200 instances where the sender would end an email with "call me on my land line" or "call me."

62.    TTR did not have to redeem its stock from CBS—it was under no obligation to pay CBS anything.  TTR's officers and directors also knew it was illegal for them to redeem CBS' stock.  But TTR's own documents show that TTR voluntarily chose to pay CBS $1.5 million to redeem its stock at the same time TTR's directors and officers were acknowledging among themselves—with frequent disclosure to CBS's Ed Schwartz—that TTR could not pay those creditors to whom TTR already owed money.  So TTR's actual intent was clear.  It was

choosing to prefer CBS—to whom it owed no obligation—over its actual creditors, and therefore it intended to hinder, delay or defraud those creditors.  Those creditors included Narayan's defrauded clients.  Its payment to CBS, therefore, was a fraudulent transfer for which the Receiver may obtain avoidance.  740 ILCS 160/8(a).

63.     Nor can CBS claim that it took the $1,500,000 in good faith.  CBS was an insider. CBS was TTR's primary holder of preferred shares, with 10,313,446 shares as of December 27, 2012.  It had a right to have a seat on TTR's board—although it never exercised that right—and, more important, it had the right to receive regular financial reports of TTR's operations.  CBS knew that TTR had tried for two years to gather $1.5 million to pay for CBS for redeeming its stock.  CBS had expressed doubt that TTR would ever be able to "get the money" to redeem its stock.  CBS knew what was going on at TTR.  It knew that TTR was operating at a huge loss each year.

64.     And, of course, the evidence of TTR's audits and the emails of its increasingly desperate officers, directors, and lawyers show that TTR was insolvent and unable to pay its bills timely when it transferred $1.5 million to CBS on December 31, 2012.  CBS knew TTR was insolvent when it took TTR's money.  CBS did not accept that payment in good faith and cannot claim the protection of 740 ILCS 160/9(a).

**B.     IUFTA §5(a)(2) Claim for Fraudulent Transfer**

65.     IUFTA also makes a transfer fraudulent as to creditors if the transfer was made without receiving a reasonably equivalent value in exchange and TTR's assets after the transaction were "unreasonably small in relation to" its business or that TTR had debts or was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.  740 ILCS 160/5(a)(2)(A), (B).

66.     Whether TTR received a "reasonably equivalent value for the transfer of $1.5 million to CBS is determined from the creditor's vantage point under the IUFTA; it focuses on what the debtor gave up and what it received that could benefit its creditors.     The benefit received must be fairly concrete. TTR's repurchase of its own stock from CBS conveyed no benefit to TTR's creditors—in fact the loss of $1,500,000 in cash available to satisfy TTR's debts was a detriment to TTR's creditors as was the $1,700,000 in additional debt.

67.     There is no question that TTR's payment to CBS left TTR with assets that were "unreasonably small" in relation to its business and that it had debts or was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.  The report from TTR's independent auditor on TTR's financial status as of December 31, 2012, when CBS sold its shares back states: "As discussed in Note 1 to the financial statements, the Companies have suffered recurring losses from operations and have a net capital deficiency that raises substantial doubt about their ability to continue as a going concern."

68.     The emails discussed above show TTR's officers and directors knew full well that TTR's payment to CBS left TTR with assets that were "unreasonably small" in relation to its business and that it had debts or was intending to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.  On December 28, 2012, Harmon wrote that buying the CBS stock has left TTR's "cupboards bare" of working capital, adding "sacrifice by all will need to continue," and he attached a listing of "the obligations we 'traded off' here at year-end in order to meet the CBS deadline. . . . .We have suffered by not being able to get out of the reactionary, day2day management that our capital structure has dictated."  On January 2, 2013, Harmon sent the board a listing of unfunded

liabilities and obligations.

**C.   IUFTA §6(a) Claim for Fraudulent Transfer**

69.     Finally, IUFTA creates liability "as to a creditor whose claim arose before the transfer was made" for a transfer if the debtor made the transfer "without receiving a reasonably equivalent value in exchange" and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.  740 ILCS 160/6(a).  The Receiver has already detailed why TTR did not receive a reasonably equivalent value in exchange for its transfer of $1,500,000 to CBS, that TTR was insolvent when it made its transfer, and that TTR became more insolvent as a result of that transfer.

70.     Under any of these provisions of the IUFTA, the transfer CBS received on December 28, 2012 is voidable as a fraudulent transfer.  The Receiver has also shown that CBS did not take this transfer in good faith because CBS was aware of TTR's insolvency so that the defense of 740/ILCS 160/9(a) is not available to CBS for any of these claims.

71.     The Receiver asks this Court to void TTR's transfer of $1,500,000 to CBS and to order CBS to return those funds with interest to the Receivership Estate.

## VI.   DAMAGES

72.     The Receiver's damages are the $1.5 million that was illegally paid to CBS for the redemption of its stock, plus prejudgment and post judgment interest on those transferred funds.

## VII.   REQUEST FOR JURY TRIAL

73.     The Receiver asserts his right to a trial by jury in this cause.

## PRAYER

For these reasons, Plaintiff asks for judgment against Defendant CBS for the following:

    a.   Actual damages of $1,500,000;
    b.   Prejudgment and post judgment interest;
    c.   Costs of suit; and
    d.   All other relief that the Court deems appropriate.

Respectfully submitted,

*/s/ John W. Thomas*
John W. Thomas
State Bar No. 19856425
John W. Thomas, Attorney at Law
114 W 7th St., Suite 1100
Austin, Texas 78701-3015
Telephone: (512) 495-1447
Facsimile: (512) 499-0094
Email:  john@jwtattorney.com

Nanneska N. Hazel
Texas State Bar No. 12813500
GEORGE, BROTHERS, KINCAID & HORTON, L.L.P.
114 West 7th Street, Suite 1100
Austin, Texas 78701
Telephone:  (512) 495-1400
Facsimile:  (512) 499-0094
Email:  nhazel@gbkh.com

**ATTORNEYS FOR RECEIVER
MICHAEL D. NAPOLI**